**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA (ALEXANDRIA DIVISION)**

**TO BE FILED UNDER SEAL – TO BE FILED UNDER SEAL**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel., Michael Handberg,<br>Plaintiffs, | )<br>)<br>) TO BE FILED UNDER SEAL<br>) |
| v. | ) DO NOT PLACE IN PRESS BOX<br>) |
| SCIENCE APPLICATIONS<br>INTERNATIONAL CORPORATION | ) CASE # 1:22CV01011 AJT/IDD<br>) |
| AND | )<br>)<br>) |
| AMAZON WEB SERVICES, INC. | )<br>) |
| AND | )<br>) |
| MICROSOFT CORPORATION | )<br>) |
| Defendants. | |

## COMPLAINT

Relator Michael Handberg brings this Complaint on his own behalf as well as on behalf of the United States pursuant to the qui tam provisions of the federal False Claims Act (31 U.S.C. § 3730 *et seq.*) and states as follows.

## INTRODUCTION

1. This *qui tam* case alleges that defendant SAIC submitted false claims to the United States associated with the cloud computing needs of the Air Force (and other federal customers who elect to use this contractual vehicle). More specifically, SAIC is the "Managed Service Provider" for an Air Force contract known as the CloudONE contract; in its official capacity as the Managed Services Provider, SAIC acts as the go-between for commercial cloud providers and the United States and manages nine broad functions related to the Air Force's cloud computing needs.

2. Among those nine broad functions, two are most important for this case: first, SAIC is responsible for the initial evaluation and procurement of commercial cloud space for each customer; as part of this initial procurement, SAIC evaluates the specific needs of the customer, selects from the available commercial cloud providers, migrates the customer to the cloud, and prepares invoices for each customer for the cost of the cloud storage and other services. Second, SAIC is responsible for making monthly payments on the government's behalf for the costs of the cloud services used by each customer.
3. By the terms of the contract between SAIC and the Air Force, SAIC is reimbursed for the costs of the customer's commercial cloud space (also known as "hosting") on a "cost reimbursement" basis; in other words, SAIC is not allowed to make any profit on this one part of the contract and is not allowed to add a fee to the monthly cost for the customer's cloud needs.
4. Despite the prohibition on adding a fee to the charges for cloud space, SAIC does in fact make a hidden profit because it solicits and receives kickbacks from cloud providers AWS and Microsoft in the form of secret discounts; instead of passing along the savings to the Air Force, SAIC simply pockets the profit.
5. Not only does SAIC break the law when it solicits and receives illegal kickbacks from AWS and Microsoft, but these illegal kickbacks also taint the decision-making process for which the Air Force pays SAIC, because SAIC is choosing commercial cloud providers based on the kickback it receives instead of based on which provider is best for the United States, creating an unmitigated conflict of interest for SAIC.

6. In the process, SAIC submitted numerous false claims to the United States and defendants AWS and Microsoft created false claims and records used to support the false claims of SAIC.

7. Relator is the original source of the information alleged herein and has met all procedural requirements of 31 U.S.C. §3730(b)(2) prior to filing this Complaint.

**JURISDICTION AND VENUE**

8. This action arises under the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. The court has jurisdiction over this action pursuant to 31 U.S.C. §§ 3732 and 28 U.S.C. § 1331.

9. Venue is proper in this district pursuant to § 3732(a) of the FCA, which provides that "[a]ny action under § 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by section §3729 occurred."

10. At all times relevant, all defendants conducted substantial business in Virginia in this judicial district and many of the FCA violations complained of herein occurred in this district and in this division. Additionally, all three defendants maintained permanent employees and offices within this judicial district. Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

**PARTIES**

11. Relator Michael Handberg is a resident of the District of Columbia and is employed by Amazon Web Services with an assigned office in Herndon Virginia; in his official

capacity as a business development executive at AWS relator learned the facts alleged in this Complaint.

12. Defendant Science Applications International Corporation (SAIC) is a Virginia corporation headquartered in Reston, Virginia. SAIC provides government services and information technology support for a wide variety of governmental and non-governmental customers throughout the world.

13. Defendant Microsoft Corporation (Microsoft) is a well-known American technology company headquartered in Seattle, Washington. It is one of the "Big Five" American information technology companies, alongside Google, Amazon, Apple, and Meta. It provides cloud computing services through its Azure service.

14. Defendant Amazon Web Services, Inc. (AWS) is a major player in the cloud computing world, and is a wholly owned subsidiary of Amazon.com, Inc. In recent years, AWS has become the major profit center for Amazon.com, Inc.

**ALLEGATIONS COMMON TO ALL COUNTS**

15. At all times relevant to this Complaint, SAIC had a contract with the Air Force to assist the Air Force with the procurement and management (among other work) of commercial cloud computing space.

16. The contract is known as CloudONE; the SAIC's Alliant Contract number is FA873213D0013 and the delivery order number is FA8726-19-F-0096. The original name of the Contract was Common Computing Environment (CCE) before it was changed to CloudONE.

17. At all times relevant, SAIC was the "Managed Services Provider" for CloudONE and, in that capacity, was required to make recommendations to the Air Force about which commercial cloud provider might be best suited to a particular need.

18. At all times SAIC was required by law to make recommendations based on what is in the best interests of the United States, and not on what is in its own best interest.

19. The SAIC onboarding briefing provided to potential CloudONE customers on slide 28 states "The Cloud One Team will review your artifacts, identify the appropriate cloud environment, and assign a migration vendor with capabilities matching your needs".

20. Among the commercial cloud providers available for SAIC to choose from were AWS, Microsoft, Google, and Oracle; these commercial cloud providers were all subcontractors to SAIC.

21. In its official capacity as the Managed Services Provider, SAIC manages most aspects of the Cloud Contract, including infrastructure, billing, security, and application migration, among other aspects.

22. From the very start of the process, the government required parties to disclose real or potential organizational conflicts of interest (OCIs). The solicitation issued on May 17, 2019, provided the following instruction:

**... Alliant 2 GWAC vendors interested in this FOPR shall submit. . .an assessment of potential or actual Organizational Conflict of Interest (OCI) issues, if any, as related to this FOPR. OCI issues include. . .the inability to render impartial assistance or advice to the Government, the inability to objectively perform contract work, or the unfair competitive advantage created by current or previous contractual efforts with the Government. A mitigation plan for any identified OCI shall be included. Prior to award, the [procurement contracting officer (PCO)] will review the submitted mitigation plan and make a determination as to whether**

**the plan adequately meets the issues and provides adequate protection to both the company and the Government.**

23. As part of the solicitation issued on May 17, 2019, the Air Force produced a Model Task Order for potential contractors to review when they prepared their submission; after the contract was awarded to SAIC, the Model Task Order became the contract between the Air Force and SAIC.

24. The Model Task Order promulgated by the Air Force contained a description of the various Contract Line Item Numbers (CLINs) for which the United States would pay, a description of the work to be provided as part of that line item, and the terms of payment.

25. Of the roughly 27 CLINs, two were "cost reimbursable" which meant that the United States would only pay the actual costs SAIC incurred for that CLIN.

26. The model task order also incorporated Air Force Federal Acquisition Regulation (FAR) Supplement clause 5352.209-9001; that clause, in turn, incorporates the OCI clause found at FAR Subpart 9.500.

27. Numerous other FAR provisions were incorporated into the contract by reference.

28. For example, FAR 31.201-5 is entitled "Credits" and makes it clear that any "rebate, allowance or other credit ... received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund."

29. Also incorporated was FAR clause 52.244-2 which controls subcontractors and the fees and costs they may charge; in particular, subsection (g) of that clause states that: "No subcontract or modification thereof placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis, and any fee payable under cost-

reimbursement type subcontracts shall not exceed the fee limitations in FAR 15.404-4(c)(4)(i).

30. Also incorporated was FAR 52.203-7, which are the anti-kickback provisions; these provisions require contractors to "have in place and follow" procedures to prevent and detect possible violations of the Anti-Kickback Act, 41 U.S.C §8701 et seq.

**COUNT ONE – VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) and (B) – KNOWING SUBMISSION OF FALSE CLAIMS TO THE UNITED STATES AND THE KNOWING CREATION OF FALSE RECORDS AND STATEMENTS MATERIAL TO FALSE CLAIMS (AGAINST SAIC, MICROSOFT AND AWS)**

31. All preceding paragraphs are reincorporated.

32. Of the 27 CLINs in the contract between SAIC and the United States, two of those CLINs were cost-reimbursable to SAIC, with no fee or profit added.

33. SAIC was paid for the work of the other 25 CLINs on either a firm-fixed price basis or a labor hour basis, but the costs associated with hosting were not supposed to carry a fee or a profit.

34. Specifically, CLINs 0010 and 0022 were for "hosting" the applications and data of the United States; in other words, for rental of the actual, physical space on a hard-disk sitting in a data center, the processing of data, and the transport of data on networks.

35. SAIC was supposed to select one its subcontractors (all of whom were eligible cloud providers) and then pass the cost for hosting along to the government with no fee or profit attached.

36. At all times relevant, SAIC knew that the United States clearly and unequivocally had no intention of paying any fee or profit on top of the costs for hosting.

37. Among other things, the Model Task Order promulgated by the government clearly stated, in numerous places, that the contractor would not be allowed to add a fee or profit to this CLIN, but would only be reimbursed for the hosting costs.

38. As just one example, Page 12 of the Model Task Order stated, in relevant part:

> **A. The Contractor shall provide support to the Partnership in procuring CSP subscriptions via the cost reimbursable CLINs [....]**
> **B. *This CLIN includes all costs associated with the tasks for CSP Hosting Services as listed in Paragraph A above.***
> ***C. This is a Cost Reimbursement (CR) CLIN.***
> ***D. No profit/fee shall be paid under this cost reimbursement CLIN. (Emphasis Added).***

39. This instruction that no profit or fee shall be paid under CLINs 0010 and 0022 is repeated for the base year and then again for each option year in the Model Task Order.

40. As if this were not clear enough, during the solicitation's question and answer period, one offeror specifically asked the government to change CLINs 0010 and 0022 to allow contractors to make a profit on this revenue.

41. Specifically, one offeror asked: "Given the fact that the Government provided plug values for the Cost Reimbursable CSP CLINs represent a significant portion of the anticipated acquisition value, would the Government consider modifying the contract type from CR to CPFF allowing offerors to propose a fixed fee on CSP CLINs that will result in an overall program margin % that is acceptable to each offeror?"

42. The government answered "No."

43. However, SAIC simply found a work-around to this prohibition, and in the process SAIC submitted false claims to the United States.

44. Cloud Service Providers AWS and Microsoft both maintain public pricing calculators accessible to all its customers that lists the price for its different services.

45. As a standard practice, Cloud Service Providers provide various discounts to its customers, based levels of spend and upfront payments, among other criteria.

46. At all times relevant, SAIC received various discounts and rebates on hosting charges that AWS and Microsoft would give to any comparable customer.

47. These discounts and rebates do not appear on the public pricing calculators, however, and SAIC represents to the government that the public pricing calculators are true and accurate representations of charges it pays on behalf of the government.

48. The statement that the public pricing calculators are true and accurate representations of the charges it pays on behalf of the government is a false statement and SAIC knew the statement was false every time it was made.

49. SAIC never passed along the discounts and/or rebates it received from AWS and Microsoft on cloud hosting, however, and instead just keeps the profit for itself.

50. Realtor has first-hand knowledge that the amount AWS charged for its cloud services is significantly lower that the amount SAIC charged the government in violation of the terms of the cost reimbursable contract.

51. There are a number of discount and rebate programs offered by cloud service providers like AWS and Microsoft; among the largest of these programs is the enterprise discount program, also known as "EDP" in the vernacular of SAIC, AWS, and Microsoft.

52. The enterprise discount program offered by AWS gave SAIC a secret discount equal to 22% of the total amount paid by the government for cloud hosting.

53. Relator has first-hand knowledge that discounts offered by Microsoft included a discount greater than 22% of the costs paid by the government for cloud hosting.

54. Relator has been told that Microsoft offers discounts up to, and in some cases exceeding, 28%.

55. As part of this scheme, SAIC had to hide this discount (among other discounts) it received under the enterprise discount program; in its efforts to hide its secret profit from the United States, SAIC and AWS created numerous false claims and/or records and/or caused numerous false claims and records to be created in addition to making false statements to the government in presentations about the CloudONE contract.

56. For example, the presenter notes from the April 2022 CloudONE Roadshow FINAL MASTER DECK page 15 falsely states: **"We do not tack on extra fees to process your compute and store invoices... if you are interested in estimating your monthly compute and store, you can utilize the cost calculator on our website info.cloudone.af.mil> under our platform, select costs... you'll then find links to both the AWS and Azure GovCloud cost calculators. Using the instructions on this page, you can fill out the calculator and get a very real estimate of your monthly compute and store fees."**

57. Additionally, the government specifically required "real-time" access to a dashboard so that the government could enjoy total pricing transparency and ensure that it was being charged fairly for the costs of its cloud hosting needs.

58. On page 16 of the Model Task Order, this requirement was described as follows, in relevant part:

**The MSP shall provide and maintain a dashboard or multiple dashboards for the following, leveraging existing CCE dashboards to the greatest extent**

**possible, and extending or replacing them where appropriate with Government approval:**

**(1) The MSP shall provide cost transparency to customers, allowing them to analyze and assess their operations and to plan their funding requirements ...**

**(2) The MSP shall provide the capabilities to allow customers to model and project their costs (e.g., cost calculators, etc.) ...**

**(3) The MSP shall provide reports which define service usage for all billable aspects of available offerings ...**

**(4) The MSP shall provide user dashboards/interfaces to track budgets, including spend reports, cost planning, direct copies of CSP bills broken out by application, and projections ...**

**(5) The MSP shall provide the ability to set limits based on cloud service usage both for individual accounts and at the appropriate organizational level(s), to include notifications and alerts, where appropriate**

**(6) The MSP shall provide dashboards that will allow application owners to view application performance, cyber compliance, resource utilization, and other metrics defined with the Government PMO**

**(7) The MSP shall provide dashboards that allow application owners and portfolio managers at all levels to have insight into where individual applications are in the migration process to include queuing prior to start of application analysis**

**(8) The MSP shall provide dashboards that reflect operations and sustainment status**

59. Based on the above requirements, it was totally clear that the government wanted, and contracted for, total price transparency.

60. However, if SAIC, AWS and Microsoft had in fact provided this total transparency, the United States would have seen the discounts and rebates that AWS and Microsoft extended to SAIC and would have understood that it was not being charged the costs.

61. On July 22, 2021, AWS employee Mary Oliva sent a Webex meeting request that included a proposed agenda for the meeting; among the meeting topics was the statement: "To keep customer from viewing EDP discounts the customer is locked out of the PAYER billing Console at the payer level."

62. When Ms. Oliva wrote "customer" she was referring to the United States.

63. Numerous other AWS employees received this message, including Carsten Schmid, Brandon Reardon and Kyle Gaffney.

64. On July 22, 2021 SAIC submitted a formal request to AWS called a "Case" to get help on moving the P1 Ninja application into AWS on CloudONE.

65. Before migrating the application to CloudONE, SAIC sought from AWS "A guarantee that the linked account root user cannot see the EDP discounts."

66. The Case number was 00780395, Linda Matthews was assigned as the case owner and the case was closed on July 26, 2021.

67. As another example of SAIC and AWS's duplicity, in April of 2022 relator became aware of a "road show" to promote and educate government stakeholders about the CloudONE contract.

68. AWS and Microsoft both provide billing consoles as part of their cloud services that are supposed to provide transparency into their cost and usage.

69. As part of that road show, a power point "deck" was presented that, among other things, purported to explain some "bugs" in the billing consoles provided by AWS and Microsoft.

70. Slide number 201 stated: "Providing a consolidated multi-CSP show back report is complex…"

71. That slide continued: "Vendor 'bugs' and other unknown anomalies" had affected billing and payment information; relator however has first-hand knowledge that there weren't any bugs in the billing system, and if there had been, it would have impacted all AWS customers and AWS would have devoted as many resources as necessary to fix the "bug."

72. That same slide continued with more false statements; specifically, SAIC and AWS stated as follows:

> **COTS platform provides robust OOTB reports that allow high level of customization to achieve actionable insights into Cloud consumption and spend data ...**
>
> **Our valued partnerships enables us to provide direct input and feedback to utility vendors to shape and steer CSP solutions to address identified bugs and gaps**

73. The acronym "COTS" means "Commercial Off-The-Shelf"; in other words, SAIC and AWS were representing to the United States that the billing dashboard required by the contract was a commercially available, off-the-shelf product.

74. In fact, this was a false statement and SAIC and AWS both knew this statement was false; the truth is that SAIC built its own billing console called the "SAIC MSP Financial Dashboard" using a 3rd party tool that had been specifically customized so that they (SAIC) could control the flow of information to the government and present the information in a way that concealed the discounts they were receiving from AWS and Microsoft.

75. All three defendants have, as alleged above, created and submitted false claims and created false records material to those false claims.

76. As a result, the United States has been damaged in an amount to be determined at trial.

**COUNT TWO – KNOWING SUBMISSION OF FALSE CLAIMS TO THE UNITED STATES AND THE KNOWING CREATION OF FALSE RECORDS AND STATEMENTS MATERIAL TO FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) and (B) (AGAINST SAIC, AWS, AND MICROSOFT)**

77. All preceding paragraphs are reincorporated by reference.

78. Relator has first-hand knowledge that SAIC has now begun to play cloud service provider subcontractors off of one another for the purposes of increasing its illegal profits and kickbacks.

79. For example, SAIC employee Russ Feller has recently complained that AWS does not provide a discount comparable to Microsoft.

80. He has told AWS employees, including relator, that Microsoft is now giving SAIC discounts greater than AWS (purportedly up to 28%) on its cloud hosting services and is offering discounts on the classified secret cloud, which AWS does not offer.

81. Feller has implied on a number of occasions that unless AWS increases the size of its discount, or kickback, it will harm the chances of AWS to get new work in the future.

82. Paying a percentage of the government's costs directly to a prime contractor in this fashion is a clear kickback.

83. Further evidence of the kickback is that SAIC is now comparing the size of the discount it receives from Microsoft to the discount it receives from AWS, and making thinly veiled threats that AWS will not receive as much work if it does not increase the size of its kickback.

84. The United States does not pay claims tainted by kickbacks, and such claims are ineligible for payment.

85. All three defendants have, as alleged above, created and submitted false claims and created false records material to those false claims.

86. As a result all three defendants have violated the federal false claims act and the United States has been damaged in an amount to be proved at trial.

## COUNT THREE -- KNOWING SUBMISSION OF FALSE CLAIMS TO THE UNITED STATES AND THE KNOWING CREATION OF FALSE RECORDS AND STATEMENTS MATERIAL TO FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) and (B) (AGAINST SAIC, AWS, AND MICROSOFT)

87. All preceding paragraphs are reincorporated by reference.

88. Under no set of circumstances does the United States pay a fee to a contractor that is calculated as a percentage of the contractor's costs.

89. To allow contractors to set a fee in this way would, obviously, give the contractor an incentive to increase the government's costs as much as possible.

90. So-called "cost plus percentage of costs" contracts are illegal under all major procurement statutes, as well as under all relevant FAR provisions.

91. The allegations above, however, clearly demonstrate that SAIC is being paid an illegal fee and profiting based on a specific percentage of the government's costs.

92. Because the United States does not pay fees set as a percentage of the government's costs, all claims made by SAIC to the United States for cloud hosting have been false.

93. All three defendants have, as alleged above, created and submitted false claims and created false records material to those false claims.

94. As a result, the United States has been damaged in an amount to be determined at trial.

95. Trial by jury is demanded.

RELATOR, ON BEHALF OF HIMSELF AND ON BEHALF OF THE UNITED STATES OF AMERICA prays for relief as follows: That the United States (a) be awarded three times the damages sustained because of the violations alleged herein in an amount to be proven at trial, as provided by the False Claims Act, 31 U.S.C. §§ 3729 et seq., and (b) that the

maximum civil penalty under the federal False Claims Act be imposed for each and every false claim proven at trial; and (c) that pre-and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in prosecuting this case; (d) that Relator be awarded the maximum relator's share possible under the federal False Claims Act; and (e) in addition, relator requests any alternative or supplemental relief the court may deem appropriate.

DATED: Sept. 7, 2022

Respectfully Submitted by Relator through Counsel:

Zachary A. Kitts
Virginia Bar # 47052
Counsel for Relator
K&G Law Group, PLLC
3554 Chain Bridge Road, Suite 100
Fairfax, Virginia 22030
Phone: 703-649-5500
Fax: 703-649-6363
Email: zkitts@kglawpllc.com