**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA (ALEXANDRIA DIVISION)**

**TO BE FILED UNDER SEAL – TO BE FILED UNDER SEAL**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel., Michael Handberg,<br>Plaintiffs, | ) TO BE FILED UNDER SEAL |
| v. | ) DO NOT PLACE IN PRESS BOX |
| | ) CASE # 1:22cv1011 |
| AMAZON WEB SERVICES, INC.,<br>AMAZON.COM, INC.,<br>MICROSOFT CORPORATION,<br>SCIENCE APPLICATIONS INTERNATIONAL CORPORATION,<br><br>AND<br><br>ACCENTURE FEDERAL SERVICES, LLP,<br>GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC.,<br>FOUR POINTS TECHNOLOGY LLC,<br>CARAHSOFT TECHNONOLOGY CORP.,<br>DLT SOLUTIONS, INC.,<br>TECH DATA SOLUTIONS, LLC,<br>STRATEGIC COMMUNICATIONS, LLC<br><br>Defendants. | ) |

## FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

This case is brought by relator on his own behalf as well as on behalf of the United States pursuant to the *qui tam* provisions of the federal False Claims Act (31 U.S.C. § 3730 *et seq*); pursuant to Fed. R. Civ. P. 15(a)(1) and (d), relator Michael Handberg amends and supplements the original *qui tam* Complaint filed under seal on September 7, 2022.

## INTRODUCTION

1. Amazon Web Services Inc. ("Amazon") controls more than one-third of the total global market for cloud computing, making it—by far—the dominant cloud

computing provider in the world. Amazon not only dominates the private cloud computing market—it is also the leading provider of cloud services to the United States government.

2. Amazon dominates cloud computing, in general, for reasons well-known to the public. For one thing, Amazon was willing to take an early gamble on cloud computing when other large technology companies—most notably, Microsoft—doubted the viability of commercial cloud computing. It is also true that Amazon offers services—and features within those services—that other cloud providers, arguably, do not.

3. But Amazon also dominates the government market for cloud computing for a reason unknown to the public: it has paid more than $725 million in kickbacks on contracts with the United States since January 1, 2019. These kickbacks were paid to a long list of companies that either re-sell or manage Amazon cloud services on behalf of the United States as part of a scheme Amazon calls "EDP" which stands for "Enterprise Discount Program."

4. Amazon is a company famously obsessed with data and performance metrics and its cloud computing business lends itself well to this kind of analysis; by its own internal metrics, which are available to the relator, Amazon has already seen a return of more than $3.6 billion on the $725 million it has paid in EDP kickbacks; in other words, this kickback scheme effectively drives revenue growth for Amazon's cloud business.

5. Amazon is also a company obsessed with rapid growth; in that regard the EDP kickback program has also served it well: using internal metrics available to him, relator learned that re-sellers and managed service providers given an EDP kickback

showed a 214% increase in cloud revenue between 2019 and 2022, while managed service providers and resellers *not* given an EDP showed an increase of 120% during the same period. These increased revenues, of course, were paid by the United States in all cases.

6. And, in the final analysis, it is this incredible 214% growth in its federal cloud business that Amazon is after because of another famous company tenet: Amazon thinks long-term. Amazon knows very well that it will continue to benefit from these EDP kickbacks for many years to come, because cloud computing is a notoriously "sticky" service. In other words, once a large, prolific cloud user—like a government agency—has incurred the effort and cost to move applications to one cloud provider, the difficulty and expense of changing providers becomes too great to justify.

7. This First Amended and Supplemental Complaint groups the defendants and violations of the law into three categories, with Amazon at the center of all three schemes.

8. First, this Complaint alleges that Amazon—together with competitor/fellow cloud provider Microsoft Corporation ("Microsoft")—paid kickbacks to Managed Service Provider SAIC on an Air Force contract known as CloudONE. These kickbacks to SAIC are calculated as a percentage of the total amount of cloud services purchased by the Air Force. Therefore, in addition to the fact that the United States does not pay claims tainted by kickbacks, the written kickback agreements in this case resulted in a "cost plus percentage of cost" contract—a form of contract that is universally prohibited in federal procurement and which all the defendants specifically promised the government not to use.

9. Moreover, because the government hired SAIC to serve as a Managed Service Provider—with a contractual duty to act in the best interests of the Air Force—this arrangement created an organizational conflict of interest on the part of SAIC which it failed to disclose and actively concealed with the assistance of both Amazon and Microsoft.

10. Second, this Complaint alleges that defendants Accenture Federal Services ("Accenture"), General Dynamics Information Technology, Inc. ("GDIT"), Four Points Technology Solutions, LLC ("Four Points"), Carahsoft Technology Corporation ("Carahsoft"), DLT Solutions, Inc. ("DLT Solutions"), Tech Data Solutions, LLC ("Tech Data") and Strategic Communications, LLC ("Strategic Communications")—all of whom either re-sell Amazon cloud to or manage Amazon cloud on behalf of various parts of the United States government—received the same type of percentage-based kickbacks from Amazon. Like the kickbacks Amazon and Microsoft paid SAIC, the secret kickbacks Amazon paid to this second group of defendants also constitute a prohibited cost-plus percentage of cost arrangement.

11. In addition, all of these defendants—as either resellers or Managed Service Providers—had a conflict of interest of the same type as SAIC.

12. Third and finally, this Complaint alleges that Amazon violated the terms of its own agreements with the United States—via its General Services Administration Agreement Multiple Award Schedule—when it gave non-governmental customers better prices than it gave to government agencies.

## PROCEDURAL BACKGROUND TO THE FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

13. Relator filed his initial Complaint *in camera* and under seal pursuant to 31 U.S.C. § 3730 on September 7, 2022. When he filed his Complaint, relator also filed a separate Motion to Seal and a proposed Order, which the Court granted, sealing the case up to and including November 15, 2022.

14. The United States was served as required by 31 U.S.C. § 3730(a)(2).

15. On or about November 4, 2022, the United States sought and obtained an extension of the seal up through April 15, 2023.

16. The United States has been informed of the filing of this First Amended and Supplemental Complaint.

## JURISDICTION AND VENUE

17. This action arises under the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. The court has jurisdiction over this action pursuant to 31 U.S.C. §§ 3732 and 28 U.S.C. § 1331.

18. Venue is proper in this district pursuant to § 3732(a) of the FCA, which provides that "[a]ny action under § 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by section §3729 occurred."

19. At all times relevant, all defendants conducted substantial business in Virginia in this judicial district and many of the FCA violations complained of occurred in this district and in this division. All defendants also maintained permanent offices and employees within this judicial district. Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

## PARTIES

20. Relator Michael Handberg is a resident of the District of Columbia and is employed by Amazon Web Services as a business development executive; relator learned the facts alleged in this case in the course of his employment. Relator is the original source of the information alleged herein and has met all procedural requirements of 31 U.S.C. §3730(b)(2) prior to filing this Complaint.

21. Defendant Science Applications International Corporation ("SAIC") is a well-known Virginia corporation headquartered in Reston, Virginia. SAIC provides government services and information technology support for a wide variety of governmental and non-governmental customers throughout the world. Upon information and belief, SAIC is a Delaware corporation.

22. Defendant Amazon Web Services, Inc. is a wholly-owned subsidiary of Amazon.com, Inc., and both companies—from this point forward referred to as Amazon—are liable for the illegal actions at issue in this Complaint. Amazon was the first company to bring a commercial cloud service to market in 2006 and is one of the "Big Five" American information technology companies, alongside Google, Microsoft, Apple, and Meta.

23. In recent years, cloud computing services have become the main profit center for Amazon and are now far more profitable than Amazon's retail delivery business. In 2021, although cloud computing accounted for only 13% of Amazon's total revenue, it generated nearly 75% of Amazon's profit. Upon information and belief, Amazon is a Delaware corporation.

24. Defendant Microsoft Corporation ("Microsoft") is a well-known American technology company headquartered in Seattle, Washington. It is one of the "Big Five" American information technology companies, alongside Google, Amazon, Apple, and Meta. It has provided cloud computing services through its Azure brand since 2010, making it the second major player to bring a cloud product to market. Upon information and belief, Microsoft is a Delaware corporation.

25. Defendant Accenture Federal Services ("Accenture") is a consulting firm providing a wide variety of professional services to the United States including re-selling and/or managing Amazon cloud services. Accenture Federal Services is a wholly owned subsidiary of Accenture, LLP, an international company consisting of more than 180,000 employees throughout the world. Upon information and belief, Accenture LLP is a Delaware limited liability partnership.

26. Of particular relevance to this case is Accenture's acquisition of a company called Novetta, LLC in 2021; prior to being acquired by Accenture, Novetta resold and/or managed Amazon cloud services to the United States and has continued in the same line of business following its acquisition.

27. Defendant General Dynamics Information Technology, Inc. ("GDIT") is a technology company engaged in supporting various defense and intelligence projects of the United States, including re-selling to and/or managing Amazon cloud services for the United States. The company has its headquarters in Falls Church, Virginia and is, upon information and belief a Delaware corporation.

28. Defendant Four Points Technology, Inc. ("Four Points") is a Service-Disabled Veteran Owned Small Business (SDVOSB) delivering IT and clinical solutions to

Government customers; the company also re-sells Amazon cloud services to and/or manages Amazon cloud services for government agencies. The company is headquartered in Chantilly, Virginia and is upon information and belief a Virginia corporation.

29. Defendant Carahsoft Technologies Corporation ("Carahsoft") is an information technology company delivering services to state and federal government agencies; the company also re-sells to and/or manages Amazon cloud services for government agencies. Carahsoft is, upon information and belief, a Maryland corporation headquartered in Reston, Virginia.

30. Defendant DLT Solutions, Inc. ("DLT") is a value-added reseller of software and hardware and professional services to federal, state, and local governments; DLT also resells to and/or manages Amazon cloud services for the United States. DLT is, upon information and belief, a Virginia corporation headquartered in Herndon, Virginia.

31. Defendant Tech Data Government Solutions, LLC is, upon information and belief, an Indiana corporation providing a variety of services to the United States including, but not limited to, re-selling and/or managing Amazon cloud services.

32. Defendant Strategic Communications, LLC is, upon information and belief, a Kentucky limited-liability company providing a variety of services to the United States including, but not limited to, re-selling and/or managing Amazon cloud services; at all times relevant to this Complaint, Strategic Communications was the prime contractor on a contract known informally within the Air Force as "Kessel Run."

**COUNT ONE**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) and (B)**

**KNOWING SUBMISSION OF FALSE CLAIMS TO THE UNITED STATES AND THE KNOWING CREATION OF FALSE RECORDS AND STATEMENTS MATERIAL TO FALSE CLAIMS (PAYMENT OF KICBACKS ON THE CLOUDONE CONTRACT) (AGAINST SAIC, MICROSOFT AND AMAZON)**

33. All preceding paragraphs are reincorporated.

34. At all times relevant to this Complaint, SAIC had a contract with the Air Force to serve as the Managed Service Provider ("MSP") for the Air Force's procurement and utilization of commercial cloud computing resources.

35. The contract is known as CloudONE; SAIC's Alliant Contract number is FA873213D0013 and the delivery order number is FA8726-19-F-0096. The original name of the Contract was Common Computing Environment ("CCE") before it was changed to CloudONE.

36. CloudONE is one of the major cloud computing environments for the Department of Defense, with the others being the Army's Enterprise Cloud Management Agency CAMO contract, the Navy's PEO Digital Cloud Management contract and DoD's Joint Warfighting Cloud Capability ("JWCC") contract.

37. As a Managed Service Provider, SAIC generally agreed to manage the cloud computing needs of the Air Force by providing professional and technical services related to cloud computing, while subcontracting with cloud service providers—like Amazon and Microsoft—for the actual cloud computing resources.

38. More specifically, in its official capacity as the Managed Service Provider for the CloudONE contract, SAIC agreed to manage the cloud computing needs of 187 individual Air Force customers, to include doing migration assessments for each new customer, recommending the best commercial cloud vendor, building cloud security

infrastructure, training Air Force employees where necessary, billing and making payment to cloud service providers, and general program management.

39. In the parlance of the contract, these 187 individual components of the Air Force are called "Mission Systems Owners" or sometimes "MSOs"

40. Among the cloud service providers available for SAIC to choose from on the CloudONE contract were Amazon, Microsoft and Oracle; these commercial cloud providers were all subcontractors to SAIC and were sometimes referred to by the acronym "CSP" for "Cloud Service Providers."

41. As of September of 2022, Amazon had by far the largest slice of the CloudONE contract among the cloud service providers; of the 187 individual Mission System Owners using CloudONE, 118 of those customers used Amazon, 68 used Microsoft, and only one used Oracle.

42. At the beginning of the CloudONE contracting process, the Air Force promulgated a Model Task Order to define the scope, fees, and costs for the work of the CloudONE contract.

43. After the CloudONE contract was awarded to SAIC, that same Model Task Order became the contract between SAIC and the United States.

44. The Model Task Order promulgated by the Air Force contained a description of the work SAIC was to perform in its role as the Managed Service Provider; the Model Task Order broke SAIC's work down into 19 Contract Line-Item Numbers (CLINs) and described the way SAIC would be paid for the work of each of those CLINs.

45. Of the 19 CLINs in the contract between SAIC and the United States, two of those CLINs—specifically CLINs 0010 and 0022—were to reimburse SAIC for the costs of

the cloud service providers; these two CLINs were cost-reimbursable only; in other words, SAIC was not allowed to add a fee or profit to those two CLINs.

46. SAIC was paid for the work of the other 17 CLINs on either a firm-fixed price basis or a labor hour basis, but the CLINs associated with cloud hosting were not supposed to carry a fee or a profit.

47. SAIC was also responsible for the complex task of administering and/or maintaining an overall-billing framework for the many different cloud-related services that would be used by the 187 Mission Systems Owners.

48. As part of this overall-billing framework, SAIC administered two "Payer Account" numbers; each one of the 187 Air Force customers was linked to one of these two Payer Account numbers.

49. Then, under these two Payer Account numbers were various "Account IDs" with each Account ID used to track usage and billing for a specific cloud "environment" used by the Air Force customer.

50. In cloud computing generally, there are two different ways to connect Account IDs to a Payer Account; one method is called ECAM—which stands for "End Customer Account Model"—and the other method is called SPAM—which stands for "Solution Provider Account Model."

51. The difference between these two models is significant, because under the ECAM model the end customer has what is known as "root access" in the cloud computing industry, which means the end customer has complete control of the account, including access to all account features, and total visibility into all account usage and billing information.

52. By way of contrast, under the SPAM model only the reseller or managed service provider has root access; thus under the SPAM model only the reseller or MSP has complete control of and visibility into the account and the re-seller or MSP can restrict the end-customer's access to some or all billing information and the account tools used to view discounts, monitor spend, recommend savings, and identify waste.

53. In this case, Amazon required the use of the SPAM model to connect the Air Force's Account IDs to the two Payer Accounts, with the result that the Air Force had no visibility whatsoever into the actual billing costs or account financial management tools, and therefore no visibility into the kickbacks paid in the form of secret pricing discounts.

54. Charges for cloud computing are incurred and billed according to usage in the same way as utilities like water or electricity; in other words, cloud computing users pay more when they use more and pay less when they use less, and the charges will often vary month-to-month.

55. Cloud service providers like Amazon and Microsoft track customer usage of each cloud service in real time using the Account ID; that usage information is provided to SAIC via an automated data feed or in the cloud management console, and at the end of the month charges from the individual Account IDs are rolled up to one of the two linked Payer Accounts for invoicing purposes.

56. SAIC, in turn, generates an invoice for each Mission Systems Owner every month using the data from Amazon and Microsoft; this monthly invoice—which SAIC also transmits to each customer—is called a "Showback Summary."

57. After the Showback Summary is delivered to each Mission Systems Owner, each MSO makes payment to the Air Force's CloudONE Program Office using an inter-governmental payment system.

58. Finally, the Air Force's CloudONE Program Office collects the money from each MSO and makes payment to SAIC, who, in turn, makes payment to each cloud service provider.

59. At all times relevant, SAIC knew that CLINs 0010 and 0022 were to be used only for reimbursement of costs incurred by SAIC to pay the cloud service providers; SAIC knew that the United States clearly and unequivocally had no intention of paying any fee or profit on top of the costs of the cloud service providers.

60. The Model Task Order promulgated by the government clearly stated, in numerous places, that the contractor would not be allowed to add a fee or profit to CLINs 0010 and 0022 but would only be reimbursed for the costs charged by the cloud service providers.

61. Specifically, Page 12 of the Model Task Order stated, in relevant part:

> **A. The Contractor shall provide support to the Partnership in procuring CSP subscriptions via the cost reimbursable CLINs [....]**
> **B. *This CLIN includes all costs associated with the tasks for CSP Hosting Services as listed in Paragraph A above.***
> ***C. This is a Cost Reimbursement (CR) CLIN.***
> ***D. No profit/fee shall be paid under this cost reimbursement CLIN. (Emphasis Added).***

62. This instruction that no profit or fee shall be paid under CLINs 0010 and 0022 is repeated for the base year and then again for each option year in the Model Task Order.

63. Further proof that no profit or fee could be attached to the costs of the Cloud Service Providers was found during the solicitation's question and answer period, when one offeror asked the government to change CLINs 0010 and 0022 to allow contractors to make a profit on the costs of the cloud service providers.

64. Specifically, one offeror asked:

**Given the fact that the Government provided plug values for the Cost Reimbursable CSP CLINs represent a significant portion of the anticipated acquisition value, would the Government consider modifying the contract type from CR to CPFF allowing offerors to propose a fixed fee on CSP CLINs that will result in an overall program margin % that is acceptable to each offeror?**

65. The government answered: "No."

66. However, SAIC simply found a work-around to this prohibition, one that required SAIC, Amazon and Microsoft to conceal the truth from the Air Force, make false claims to the United States and make false records or statements in support of those false claims.

67. Amazon and Microsoft both publish their Commercial Service Catalog Price Lists using public pricing calculators found on their websites; these public pricing calculators allow users to enter information—such as their cloud usage and the specific products they use—and then determine how much they will be charged for cloud services.

68. Amazon and Microsoft both represent to the United States that these public pricing calculators are true and accurate representations of their commercial catalog pricing; for example, Amazon's GSA Schedule states as follows:

**Amazon commercial pricing may be found at https://aws.Amazon.com/pricing. To the extent the price billed to any GSA customer for any particular service or feature differs from awarded pricing, Amazon will, as a matter of regular**

**contract administration, perform a reconciliation at the end of each month and issue credits, as appropriate.**

69. In order to promote the CloudONE contract to potential Air Force customers all three defendants participated in presentations to the Air Force called the "CloudONE Roadshow;" and as part of that presentation all three defendants made numerous false statements and false representations.

70. A PowerPoint presentation was part of the CloudONE Roadshow; the presenter notes from page 15 of the April 2022 CloudONE Roadshow state:

**We do not tack on extra fees to process your compute and store invoices… if you are interested in estimating your monthly compute and store, you can utilize the cost calculator on our website info.cloudone.af.mil> under our platform, select costs… you'll then find links to both the Amazon and Azure GovCloud cost calculators. Using the instructions on this page, you can fill out the calculator and get a very real estimate of your monthly compute and store fees.**

71. The truth, however, is that Amazon and Microsoft both provide secret discounts to resellers and MSPs that they do not provide to the United States and that are not disclosed in the public pricing calculators.

72. At all times relevant, SAIC was among the customers that received various secret discounts and rebates on charges from both Amazon and Microsoft.

73. The discounts and rebates given to SAIC do not appear on the public pricing calculators, even though SAIC, Amazon, and Microsoft all represent to the government that the public pricing calculators are accurate representations of the charges SAIC pays on behalf of the Air Force every month.

74. In meetings with Air Force customers Amazon routinely refers individuals to the public pricing calculators to estimate their costs for Amazon cloud services, even

though they knew SAIC was receiving a 22% EDP discount that was not included in the public pricing calculators.

75. Statements by SAIC, Amazon and Microsoft that the public pricing calculators are true and accurate representations of the costs paid by SAIC on behalf of the Air Force are false and all three defendants knew these statements were false every time the statements were made.

76. Among the many FAR provisions incorporated into the CloudONE contract was FAR 31.201-5 which is entitled "Credits" and states:

**[A]ny rebate, allowance or other credit ... received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund.**

77. Despite this clear contractual requirement, SAIC never passed along the discounts and/or rebates it received from Amazon and Microsoft for the costs of cloud hosting, and instead just kept the profit for itself; moreover, SAIC did this with full knowledge and cooperation from Amazon and Microsoft.

78. As part of this scheme, SAIC had to hide the discounts it received; in its efforts to hide its secret profit from the United States, SAIC, Amazon and Microsoft created numerous false claims and/or false records and/or caused numerous false claims and records to be created in addition to making false statements to the government in presentations about the CloudONE contract.

79. Proof that Amazon and SAIC both knew they were submitting false claims to the United States can be found in the Amazon Customer Agreement and the Amazon Partner Network Terms and Conditions; these documents were prepared by Amazon and SAIC was required to sign both.

80. The Amazon Partner Network Terms and Conditions define "benefits" as follows in paragraph 2.1(a):

> **(a) Generally. As part of the Program, we might invite you to participate in opportunities or provide you with funding or other benefits (collectively, "Benefits") related to your activities that support usage, promotion, or knowledge of Amazon services (collectively, "Projects").**

81. In paragraph 2.1(d)(i) the Amazon Partner Network Terms and Conditions state clearly that where there is a "Government Customer Project", and benefits are paid by Amazon in the form of funding:

> **Government must derive independent financial benefit from your consumption of the Benefits (i.e., free or discounted products or services from you).**

82. The Amazon Partner Network Terms and Conditions also provide, in subparagraph 2.1(d)(ii):

> **(ii) You will comply with all applicable Government procurement laws rules, regulations, and contract provisions, including any that pertain to discounts and rebates, or that pertain to ethics and integrity (e.g., prohibitions against gratuities, bribery, corruption, kickbacks, conflicts of interest, false statements or claims, etc.). Your use of Benefits must not create a conflict of interest (or the appearance of a conflict of interest) for you or Amazon, or give rise to any liability for Amazon. Amazon recommends you confirm with the Government customer's contracting officer, ethics official, or other applicable Government representative that your use of Benefits is lawful, ethical, and permissible.**

83. The Amazon Customer Agreement and Network Terms and Conditions show clearly that Amazon is aware of its various legal duties and, therefore, that Amazon is aware that its actions—and the actions of SAIC—in this case are illegal.

84. Amazon was aware that SAIC completely failed to meet these standards; far from enforcing its own agreements, Amazon played an active role in helping SAIC violate the terms of its own agreements and then conceal those violations.

85. Alternatively, Amazon showed reckless disregard for the truth or falsity of its statements and claims and these two documents make that clear.

86. On or about June 22, 2020, Amazon and SAIC entered into a formal written agreement entitled "AMAZON SOLUTION PROVIDER PRIVATE PRICING ADDENDUM" that provided for the 22% Enterprise Discount.

87. In this agreement, Amazon gave SAIC various incentives, including an Enterprise Discount Program (EDP) price equal to 22% of the total amount paid by the Air Force for the costs of qualified Amazon cloud services.

88. To qualify for this 22% discount, however, SAIC had to promise that it would spend at least $58 million of the Air Force's money on Amazon cloud services by April 30, 2024.

89. Therefore, this arrangement gave SAIC at least two incentives to increase the Air Force's cloud costs as much as possible: first, SAIC promised Amazon that the Air Force would buy at least $58 million worth of Amazon cloud services; second, because SAIC would receive a kickback of 22% of the total the Air Force spent on Amazon cloud, the more money the Air Force paid for Amazon cloud services, the more profit SAIC would make.

90. That agreement further provides, in paragraph nine:

**Each party agrees that the existence and terms of this Addendum are not publicly known and will not be disclosed by that party.**

91. In addition to the 22% EDP discount, various other discounts applied to different types of cloud services available under the CloudONE contract; SAIC received the following discounts from Amazon: (1) Partner pricing discounts; (2) "Free Tier"

discounts; (3) Reserved Instance discounts; (4) Enterprise Support discounts, and (5) Marketplace discounts.

92. At times, one or more of these discounts were "stacked" together to create discounts of more than 22%.

93. As will be discussed in more detail later, relator has first-hand knowledge that Microsoft offered the same types of discounts and rebates as Amazon; specifically, SAIC stated the Microsoft secret discount was 40%.

94. On May 17, 2022, SAIC generated a Showback Summary for charges incurred by the Air Force Mission System Owner known as "ELICSAR" in the month of April 2022.

95. All Air Force customers on the CloudONE contract ultimately had their cloud costs lumped under either Payer Account *******3247 or Payer Account *******1738.

96. The cloud costs incurred by ELICSAR were ultimately included on Payer Account *******1738.

97. This Showback Summary was labeled "Amazon_42022" and covered charges across 11 Account IDs incurred by the Air Force customer ELICSAR for the period of time from April 1, 2022 to April 30, 2022.

98. In total, this Showback Summary reported to the Air Force that SAIC would pay Amazon the total amount of $459,629 for ELICSAR's cloud computing needs for the month of April 2022.

99. This document was also a claim that sought payment from the United States in the amount of $459,629.

100. However, this claim for payment was false, and SAIC knew this claim was false at the time it was submitted; this claim for payment was false because it sought

reimbursement for costs SAIC had not actually incurred, and because it sought reimbursement for those costs under a CLIN that was to be used only for the costs of the cloud service providers.

101. The United States, not knowing that the claim was false and not knowing that it was paying for costs SAIC had not actually incurred, paid the full amount of $459,629.

102. When relator compared the charges found in the April Showback Summary to information available to him at Amazon, he could see that SAIC had paid Amazon only $360,369 for the cloud services used by ELICSAR in April of 2022.

103. As a result, SAIC made a secret, hidden profit on just this one invoice, for this one customer, for this one month, in the amount of $99,259.

104. As a more specific example from the April Showback Summary, SAIC made a claim for payment for one Account ID used by ELICSAR—ending with the last four digits 5316—that included a charge of $5,416.35 for an Amazon cloud service called "CloudWatch."

105. When relator compared the claim submitted to the United States with information available to him at Amazon, he could see that SAIC had paid Amazon only $4,224.76 for CloudWatch on Account ID 5316, resulting in a difference of $1,191.60 for this one service, on this one Account ID, for this one customer, under this one Payer Account, for this one month.

106. SAIC submitted charges incurred by ELICSAR under a total of 11 Account IDs on the April 2022 Showback Summary; each of those charges, in turn, was charged to Payer Account *******1738.

107. In addition to the 11 Account IDs for charges incurred by the ELICSAR customer, Payer Accounts *******1738 and *******3247 were, together, charged for a total of 439 claims.

108. In total, for the 439 individual claims to Payer Accounts *******1738 and *******3247 SAIC submitted false claims for payment to the United States in the amount of $3,632,645 and was paid this amount by the United States.

109. The claims for Payer Accounts *******1738 and *******3247 were false and SAIC knew these claims were false when they were made; the truth, which SAIC knew, was that SAIC would pay Amazon only $2,763,008, and it therefore reaped a windfall in the amount of $869,636 for the month of April of 2022.

110. Relator has first-hand knowledge that SAIC didn't refund this money to the government and simply kept the profit for itself because SAIC Vice-President Russ Fellers openly said that the CloudONE reseller business was a huge profit center for SAIC.

111. Among the FAR provisions incorporated into the contract was FAR 52.203-7, which are the anti-kickback provisions; these provisions require contractors to "have in place and follow" procedures to prevent and detect possible violations of the Anti-Kickback Act, 41 U.S.C § 8701 *et seq*.

112. Among other things, FAR 52.203-7 specifically makes it unlawful to include the amount of a kickback in the contract price charged by a prime Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor.

113. As alleged here, SAIC—with the full knowledge and cooperation of Amazon and Microsoft—did include the price of the kickback in the amount charged to the federal government, because SAIC got a secret discount on all amounts charged to the United States by Amazon and Microsoft and kept the difference as profit.

114. Also incorporated into the contract was FAR provision 52.203-13, which requires contractors to "exercise due diligence to prevent criminal conduct" and to "otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law."

115. SAIC, Amazon and Microsoft either didn't have these required safeguards in place or the safeguards they did have in place completely failed.

116. The anti-kickback provisions of FAR were material to the United States and were material to its decision to pay the invoices of SAIC.

117. It is also an important policy of the government that the United States does not pay claims that are tainted by kickbacks, and such claims are not eligible for payment.

118. When the contract started in January 2020, SAIC charged for services associated with 136 Account IDs that first month; by December 2022 559 Account IDs incurred charges. In total, SAIC submitted 11,707 false claims for payment over the first 36 months of the contract for the Account IDs under Payer Account *******1738 and this is only one of the two Payer Account at issue.

119. Not only were these claims false because the EDP discount given to SAIC was a percentage-based kickback, these claims were also false because SAIC submitted claims for payment to the Air Force for costs it knew it had not incurred under two specific line items that were to be used only for reimbursement of incurred costs.

120. Although SAIC promised Amazon in June of 2020 to spend a minimum of $58 million on Amazon cloud over a 48-month period, this minimum target was reached in less than 21 months.

121. In total, by August of 2022, SAIC had paid Amazon more than $82.9 million for the costs of the Air Force's cloud computing needs.

122. At the same time, SAIC had told the Air Force that it had paid Amazon more than $110 million for cloud services—and had created and submitted false records showing that it owed Amazon $110 million—allowing SAIC to receive a kickback of more than $24 million.

123. The numbers are not precise because in some situations other discounts are "stacked" on top of the 22% EDP discount for various applications and services, leading to a discount of more than 35% in some scenarios.

124. In terms of the total amount of money paid, the kickbacks Microsoft paid to SAIC were less but only because Microsoft had a smaller share of the CloudONE contract.

125. Relator was able to determine that for just for the eight-month period from January 2022 through August 2022, SAIC overcharged the United States more than $5.3 million for Microsoft cloud services in the same way as it overcharged the United States for Amazon cloud services.

126. Every month, SAIC submitted a bill to the government using DD Form 1155, as required by the contract; DD Form 1155 includes a certification in box 36 that states:

**I CERTIFY THIS ACCOUNT IS CORRECT AND PROPER FOR PAYMENT.**

127. Every month an officer or employee of SAIC signed this box, even though the account was not correct and proper for payment.

128. As alleged in more detail below, SAIC, Amazon and Microsoft had full knowledge of the falsity of these claims and all three defendants were enthusiastic participants in this scheme; indeed, the continued success of this scheme depended on the cooperation and participation of all three defendants.

129. As a result of the actions of Amazon, SAIC and Microsoft, the United States has been damaged in an amount to be proved at trial.

**COUNT TWO**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) and (B)**
**KNOWING SUBMISSION OF FALSE CLAIMS TO THE UNITED STATES AND THE KNOWING CREATION OF FALSE RECORDS AND STATEMENTS MATERIAL TO FALSE CLAIMS**
**(VIOLATION OF THE PROHIBITION ON CONFLICTS OF INTEREST)**
**(Against Defendant SAIC)**

130. All preceding paragraphs are reincorporated.

131. Creating and maintaining a cloud computing environment—even a simple one—is challenging from both a business and a technological point of view; many of the concepts and terminology are new and unfamiliar to all but a very limited number of specialists.

132. In addition, much of the Air Force's cloud computing work consists of complex tasks like "crunching" enormous volumes of data, running simulations, and other non-standard computing needs.

133. On top of that, as the ELICSAR example above shows, the millions of dollars a month in cloud costs incurred by the Air Force on CloudONE consists of thousands upon thousands of individual charges incurred over hundreds of Account IDs for the applications used by 187 different customers.

134. Moreover all 187 customers have their claims for payment combined under one of two Payer Accounts; to make matters more complicated, cloud computing charges vary according to usage and therefore change from month to month, day to day, and hour by hour.

135. For example, monthly invoices for a typical Account ID can have thousands of individual charges for different cloud services; the Commercial Price List for AWS's US East Region has 345,632 individual catalog items, each with its own price.

136. Simply put, it is difficult for any entity of any size to choose a qualified cloud service provider, pick the services it needs, supervise the migration to and build-out of those services, migrate its applications, continuously monitor usage month in and month out, and perform other work to make sure the amounts charged are accurate.

137. For these reasons and more, the Air Force did what many large entities do—it hired a Managed Service Provider to manage the entire process, protect the Air Force's interests, and provide material assistance with every aspect of cloud computing.

138. In its official capacity as the Managed Services Provider, SAIC was hired to manage all aspects of the CloudONE contract on behalf of the Air Force including, but not limited to, ensuring that the Air Force received the best value possible for its money.

139. In its capacity as the Managed Service Provider, SAIC was required by law and by the contract between the parties to make recommendations based on what is in the best interests of the Air Force, and not on what is in its own best interests; indeed,

SAIC's expert and impartial judgment in cloud computing was among the things for which SAIC was paid by the Air Force.

140. For this reason among others, from the very start of the process, the government required parties to disclose real or potential organizational conflicts of interest (OCIs). The solicitation issued on May 17, 2019, provided the following instruction:

**Alliant 2 GWAC vendors interested in this FOPR shall submit. . .an assessment of potential or actual Organizational Conflict of Interest (OCI) issues, if any, as related to this FOPR. OCI issues include. . .the inability to render impartial assistance or advice to the Government, the inability to objectively perform contract work, or the unfair competitive advantage created by current or previous contractual efforts with the Government. A mitigation plan for any identified OCI shall be included. Prior to award, the [procurement contracting officer (PCO)] will review the submitted mitigation plan and make a determination as to whether the plan adequately meets the issues and provides adequate protection to both the company and the Government.**

141. The model task order incorporated Air Force Federal Acquisition Regulation (FAR) Supplement clause 5352.209-9001; that clause, in turn, incorporates the OCI clause found at FAR Subpart 9.500.

142. In addition, FAR Subpart 9.502 specifically recognizes that organizational conflicts of interest are most likely to occur in contracts—like CloudONE—that involve: (1) Management support services; (2) Consultant or other professional services; (3) Contractor performance of or assistance in technical evaluations.

143. Around the same time, the Air Force also prepared a Statement of Objectives; in the Statement of Objectives, as well as in the contract itself following the award, SAIC was required to manage its subcontractors and the distribution of work to those subcontractors in a way that either prevented organizational conflicts of interest or mitigated them when they arose.

144. The Statement of Objectives also made it clear that the Managed Service Provider was not to have a financial interest in selecting a cloud service provider; specifically section 4.3.1 on page 10 states:

**It is in the Government's interest to preserve objectivity in the analysis process and results. Therefore, the MSP is prohibited from proposing migration to any Cloud Service Offering (CSO) for which the DoD Provisional authorization is owned and maintained by the MSP.**

145. The kickback scheme alleged in this Complaint clearly impaired SAIC's objectivity.

146. At all times relevant the Statement of Objectives and other legal requirements placed the final say over conflicts of interest with the government.

147. The Air Force and the United States both prohibit OCIs on the part of contractors because OCIs have the potential to impair contractor decision-making; this is especially important in a contract such as CloudONE because, as alleged above, the Air Force hired SAIC to protect the interests of the Air Force and exercise its technical discretion and expert professional judgment on matters that are plainly not part of common knowledge.

148. The government's concerns about OCIs proved well-founded on the facts of this case, because SAIC profited from causing the Air Force to pay far more for cloud services than it should have paid.

149. Moreover Amazon EDPs like the one signed by SAIC require the MSP's client—without the client's knowledge—to use a certain set amount of cloud services for the MSP to receive the discount; on the facts of this case, SAIC promised that the Air Force would use at least $58 million in Amazon cloud services. EDP agreements generally require 20% or more growth in cloud spend, so resellers like SAIC are

under pressure to add new customers or spend more on existing customer Account IDs to reach their revenue commitments, even if these actions are not in the government's interest.

150. Amazon and Microsoft both profited greatly from this scheme, and not only in the form of increased cloud usage; both defendants will continue to profit from this scheme for decades to come, because cloud computing services are "sticky" in the sense that once a customer has committed to hosting data and applications with a particular provider, it becomes very difficult and time consuming to switch providers.

151. Relator has first-hand knowledge that SAIC has now begun to play cloud service provider subcontractors off one another for the purposes of increasing its illegal profits and kickbacks.

152. For example, SAIC employee Russ Feller has recently complained that Amazon does not provide a discount comparable to Microsoft.

153. He has told Amazon employees, including relator, that Microsoft is now giving discounts greater than Amazon on its cloud hosting services and is offering discounts on the classified secret cloud, which Amazon does not offer on CloudONE.

154. Feller has implied that unless Amazon agrees to the changes SAIC would like to make to their agreement, it will harm the chances of Amazon to get new work in the future.

155. Other SAIC officers and employees have not been as coy as Fellers and have been more direct: on October 19, 2022, Matt Edie (who serves as SAIC's Vice President of Finance) sent an email to several Amazon employees, including relator, regarding the

negotiations then in progress between SAIC and Amazon for a renewed EDP agreement.

156. At that time, the negotiations had been ongoing for a number of months, and the parties had been unable to reach agreement, with SAIC pushing for a larger discount and a smaller commitment, and Amazon pushing for a larger commitment.

157. Edie included the following thinly veiled threat in his October 19 email:

> **There is competition to drive the price down to capture market workshare. [Microsoft] Azure continues to push their direct discounting model which significantly reduces on demand pricing to lower than 1 year RI equivalents, (important to note this Azure direct discounting model is not in place today, but likely will be on Cloud One prior to year-end) making the Amazon optimization efforts as well as incremental cross functional discount critical to continued growth of the Amazon environment.**
>
> …
>
> **Other CSPs are looking at additional targeted discounting specific to compute, as they start to compare their billing models to those of more mature CSPs in the market. Price continues to be a factor in the decision to move to the cloud, and specifically what cloud to leverage. We need to partner and continue to drive change in our agreements, so that Amazon stays in the lead [Cloud Service Provider] position on the largest production DoD cloud environment there is.**

158. Here, even as Edie clearly threatened the "continued growth of the Amazon environment" and talked about the need to "partner and continue to drive change in our agreements so that Amazon stays in the lead position" he did so with full knowledge that Amazon has significantly more of the Air Force's total cloud spend on this contract.

159. Edie's email is also important for a less obvious reason: Within Amazon and SAIC, efforts to hide the truth from the government are often justified by a supposed concern about anti-competitive behavior and the need to avoid any appearance of

"price fixing." Indeed, Amazon employees spend a great deal of time going through the motions of keeping Amazon information, such as contract pricing, secret from Microsoft and Microsoft presumably does the same.

160. Edie's email clearly shows that Amazon's supposed reason for secrecy about discounts is not truthful. Edie's email clearly continues an ongoing conversation between Amazon and SAIC and assumes knowledge on the part of the recipients of the terms Microsoft is offering.

161. In fact, throughout the negotiations, SAIC routinely shared Microsoft's pricing information with Amazon—to force Amazon to offer more favorable terms—and relator assumes that SAIC did the same with Microsoft.

162. His email also says that "other CSPs are looking at additional targeted discounting specific to compute, as they start to compare their billing models to those of more mature CSPs in the market" which clearly indicates that some CSPs do in fact have access to the pricing information of their competitors because they are starting to compare billing models.

163. Finally in late January 2023, SAIC and Amazon came to terms for a new EDP kickback agreement; Mary Oliva and Brendan Peirce handled these negotiations on behalf of Amazon and the relator was notified on January 27th of Amazon Web Services CEO Adam Selipsky's final approval.

164. The new EDP will require SAIC to spend at least $114 million of the Air Force's money on Amazon cloud services over a 20-month period in return for a 23% kickback; the agreement will also call for the inclusion of a number of new Payer Accounts in Amazon's Air Force portfolio.

165. At the time this agreement was signed Amazon employees involved in the approval process—including but not limited to Mary Oliva, Brendan Peirce, Liz Martin, Chris Doty, and Omar Altalib—all knew that SAIC was not passing on the EDP discount to the Air Force; relator knows this because prior to the execution of the new EDP agreement, relator raised the issue with all these individuals in several meetings.

166. In these meetings, relator made it clear to these individuals that SAIC was not passing Amazon discounts along to the Air Force; relator also told all of these individuals that SAIC was charging the Air Force for costs that it had not actually incurred under two CLINs that were to be used only for the costs SAIC incurred with no profit or fee attached.

167. Also during these meetings, relator discussed with all of these individuals that many Air Force customers were complaining about the costs of Amazon on the CloudONE contract compared to other contracts. Relator also raised the topic of OCIs and said plainly that SAIC had an OCI on the CloudONE contract.

168. Following this series of meetings, Amazon disregarded all of relator's concerns and went forward with the new EDP agreement; they did, however, stop inviting relator to future meetings.

169. Every week, a report is generated called the "Top Deals Prep Cheat Sheet;" this report lists large EDP contracts under negotiation, together with the price, the total spend commitment, the person or persons responsible for the contract, the next steps required to close the deal, and other information.

170. The opportunity to sign new EDP agreements drives growth at Amazon and these reports are reviewed weekly at the highest levels of Amazon; not surprisingly, some EDP opportunities are tracked at the VP/Director level and some are tracked by the CEO.

171. Clearly, SAIC has totally abandoned its duty as a Managed Service Provider to ensure that every dollar spent by the Air Force went as far as possible and instead maximizes its own gain at the expense of the Air Force and, ultimately, the taxpayer.

172. SAIC's conflict of interest here is clear, because under this form of agreement the more money the Air Force spends, the more money SAIC makes, and this is true not only of the percentage-based kickback Amazon and Microsoft pay but also because SAIC has greater bargaining power in its dealings with Amazon and Microsoft as the CloudONE contract becomes larger and more lucrative.

173. SAIC certified at the beginning of the contracting process that it had no conflicts of interest, but this certification was not true and SAIC knew it was not true; also SAIC was required by the terms of the contract to notify the United States if an OCI arose after the contract was awarded, but they failed to do that also because if they had the Air Force would not have allowed them to continue in their role as the MSP.

174. The Model Task Order contained the following provision: **The Contractor shall not contract with Government prime Contractors or first tier subcontractors in such a way as to create an organizational conflict of interest** …" yet SAIC did just that by entering into its EDP kickback subcontract with Amazon.

175. It is also clear that the United States is serious about preventing OCIs because—as SAIC knew at the time—Leidos had previously been the MSP on the CloudONE

contract and had been eliminated from consideration in the recompete because of an unmitigated conflict of interest.

176. SAIC was required to certify on a regular basis, usually monthly, that it had no conflicts of interest; had it not made this certification, its bills would not have been paid.

177. Had the United States known that each one SAIC's claims were tainted by an OCI, the United States would have refused to pay those claims.

178. SAIC has, as alleged above, created and submitted false claims and created false records material to those false claims.

179. As a result, SAIC has violated the federal False Claims Act and the United States has been damaged in an amount to be proved at trial.

**COUNT THREE**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) and (C)**
**(SUBMISSION OF FALSE CLAIMS TO THE UNITED STATES)**
**(CONSPIRACY TO SUBMIT FALSE CLAIMS TO THE UNITED STATES)**
**(AGAINST SAIC, AMAZON, AND MICROSOFT)**

180. All previous paragraphs are reincorporated.

181. The complex FCA violations alleged in this case required the agreement, cooperation, and active participation of Amazon, Microsoft, and SAIC, and all three defendants conspired together to submit false claims to the United States, make false records and statements to conceal overpayments from the United States, and otherwise violate the terms of the FCA.

182. In addition to alleging a conspiracy against all three defendants, this count also includes a specific, unique false claim not alleged elsewhere that SAIC caused and which Amazon and SAIC then conspired together, after the fact, to hide.

183. As part of its efforts to maximize the value it received from the CloudONE contract, the government specifically required—and contracted with SAIC to receive—real-time access to a dashboard that would provide "total pricing transparency" and ensure that Air Force employees could track their cloud expenditures as they were incurred.

184. Because cloud services are billed according to usage, dashboards or billing consoles are standard in the cloud computing environment, and both Amazon and Microsoft normally provide such billing consoles to their customers. These billing consoles allow the customer to do many things, including keeping their costs within a certain budget.

185. In subsection 4.6 of the Statement of Objectives issued on May 19, 2019, the Air Force described its need for total cost transparency and, to that end, the creation and maintenance of such a dashboard was part of the work of the contract and was to be performed and billed under CLIN 0009.

186. On page 16 of the Model Task Order, this requirement of the Managed Service Provider (MSP) was made explicit and described as follows, in relevant part:

**The MSP shall provide and maintain a dashboard or multiple dashboards for the following, leveraging existing CCE dashboards to the greatest extent possible, and extending or replacing them where appropriate with Government approval:**

**(1) The MSP shall provide cost transparency to customers, allowing them to analyze and assess their operations and to plan their funding requirements …**

**(2) The MSP shall provide the capabilities to allow customers to model and project their costs (e.g., cost calculators, etc.) …**

**(3) The MSP shall provide reports which define service usage for all billable aspects of available offerings …**

**(4) The MSP shall provide user dashboards/interfaces to track budgets, including spend reports, cost planning, direct copies of CSP bills broken out by application, and projections …**

**(5) The MSP shall provide the ability to set limits based on cloud service usage both for individual accounts and at the appropriate organizational level(s), to include notifications and alerts, where appropriate**

**(6) The MSP shall provide dashboards that will allow application owners to view application performance, cyber compliance, resource utilization, and other metrics defined with the Government PMO**

**(7) The MSP shall provide dashboards that allow application owners and portfolio managers at all levels to have insight into where individual applications are in the migration process to include queuing prior to start of application analysis**

**(8) The MSP shall provide dashboards that reflect operations and sustainment status**

187. Based on the above requirements (among other requirements) it was totally clear that the government wanted, and paid SAIC to provide, total price transparency.

188. However, if SAIC had provided this total transparency, the United States would have seen the discounts and rebates that Amazon and Microsoft extended to SAIC and would have understood that it was not receiving credit for the discounts and rebates received by SAIC.

189. Amazon and SAIC, through their agents and employees, repeatedly conspired together and entered into numerous agreements that were critical to minimizing the Air Force's visibility into and understanding of its cloud computing costs.

190. On numerous occasions employees of both Amazon and SAIC worked together and coordinated their false statements and misrepresentations to keep the United States from learning the truth.

191. For example, on July 22, 2021, Amazon employee Mary Oliva sent a Webex meeting request that included a proposed agenda for the meeting; among the meeting topics was the statement: **"To keep customer from viewing EDP discounts the customer is locked out of the PAYER billing Console at the payer level."**

192. When Ms. Oliva wrote "customer" she was referring to the United States, and when she wrote "EDP" she meant Enterprise Discount Program.

193. This meeting request was sent to numerous SAIC employees, including Carsten Schmid, Travis Ferguson, and Liam Trent.

194. Also on July 22, 2021, Amazon received a message in Salesforce by SAIC (these communications are called a "Case" or a "Support Case" in Salesforce) regarding an application called P1 Ninja.

195. SAIC's employees had opened this Support Case to get assurances from Amazon—before migrating the P1 Ninja application to CloudONE—that Air Force employees would not be able to see the discounts that SAIC received from Amazon.

196. Specifically, the Support Case from SAIC sought **"A guarantee [from Amazon] that the linked account root user cannot see the EDP discounts"**

197. Amazon, acting through its agents and employees, completed the work necessary to guarantee SAIC that the Air Force would not be able to see the EDP discounts.

198. The Support Case number was 00780395; Amazon employee Linda Matthews was assigned as the case owner, and the case was closed on July 26, 2021.

199. As another example of SAIC, Microsoft, and Amazon's cooperation and participation in this conspiracy, in April of 2022 all three defendants participated in a "road show" to promote and educate government stakeholders about the CloudONE contract.

200. As part of that road show, a power point "deck" was presented that, among other things, purported to explain some "bugs" in the billing consoles provided by Amazon and Microsoft.

201. Slide number 201 stated: "Providing a consolidated multi-CSP show back report is complex…"

202. That slide continued, telling the attendees that "Vendor 'bugs' and other unknown anomalies" had affected billing and payment information; relator however has first-hand knowledge that there weren't any bugs in the Amazon billing system, and if there had been, it would have impacted all Amazon customers and Amazon would have devoted as many resources as necessary to fix the "bug."

203. That same slide continued with more false statements; specifically, agents of SAIC, Microsoft and Amazon all represented as follows to the government:

> **COTS platform provides robust OOTB reports that allow high level [sic]of customization to achieve actionable insights into Cloud consumption and spend data …**
>
> **Our valued partnerships enables [sic] us to provide direct input and feedback to utility vendors to shape and steer CSP solutions to address identified bugs and gaps"**

204. The acronym "COTS" means "Commercial Off-The-Shelf;" in other words, SAIC and Amazon were representing to the United States that the billing dashboard required by the contract was a commercially available, off-the-shelf product, and OOTB means "Out Of The Box" which meant the product would not be altered.

205. Slide number 202 continued with more false information, stating:

> **[The] SAIC MSP Financial Dashboard provides MSOs with a collection of financial reports that include visualizations and data in near real time that enable at-a-glance monitoring as well as in-depth analysis of cloud spend to aid in identifying potential cost optimization.**

206. Although such features are always found in the basic cloud computing infrastructure, these statements were false in this context.

207. Had SAIC allowed the government root level access to the Microsoft and Amazon cloud management console, the government would have seen all charges, discounts, credits, and rebates with full visibility into their actual cloud costs and would have stopped the kickback scheme as soon as it started.

208. To prevent this from happening, SAIC built its own billing console called the "SAIC MSP Financial Dashboard" and that console had been specifically customized so that SAIC could control the flow of information to the government and conceal the kickbacks SAIC received from Amazon and Microsoft from the United States.

209. SAIC's custom-made billing console also allowed it to hide discounts and manipulate information to make it appear the invoiced amounts were the cost Amazon and Microsoft charged SAIC.

210. SAIC's proprietary billing system also allowed it to withhold key information about a customer's usage making it impossible to compare the pricing on an invoice to the Commercial Service Catalog Price found in the public pricing calculator to determine if the invoice was accurate.

211. Concealing information about the Air Force's usage was also important because it prevented the Air Force from learning options for optimizing the cloud environment, from learning how resources were shared between Account IDs, from setting alerts to track spikes in charges in real-time, and other basic, common-sense information that would be helpful to lower the costs.

212. Representatives of SAIC, Amazon, and Microsoft were all present during the presentation of this PowerPoint and did not take any steps to correct the information or make it truthful.

213. As one additional example, on April 22, 2022, Amazon employee George Rolston posted a message using Slack asking:

**Hi, for CloudOne, does anyone know of customer [sic] using it that have [sic] access to cost explorer or some mechanism to monitor their spend in their CloudOne accounts? Current customer moving into CloudOne has been accustomed to using cost explorer and CUR [cost usage report] to find information.**

214. Amazon employee Mary Oliva responded with the following non-answer:

**Cloud One has their own accounting system since it is Gov't to Govt't Contractor relationship. Has the customer gone through the C1K (Cloud One Kick-Off)? This topic is touched on and as they go through the process there is more fidelity into the billing. Since we do not own the contract and are named CSP among others – we do NOT offer traditional Amazon tooling (not to say they don't use these tools – just highlighting we are removed from the billing). Right now it's a custom billing and they have access to their console and can see their consumption. The billing is separate and can be confirmed with the C1 PMO.**

215. Rolston, who works for Amazon as a Solutions Architect, was familiar with the typical Amazon cost reporting tools and was trying to locate these tools on behalf of a customer who was also familiar with the normal Amazon cost tools.

216. However, in this response to Rolston's Slack message, Oliva does her best to obscure the issue because if this customer was able to use cost explorer and see a CUR, SAIC's secret profit would be exposed.

217. Another concrete example of cooperation between SAIC and Amazon occurred in February or March of 2022, when the ELICSAR program office in the Air Force began to have questions about the costs it was paying for cloud storage, which were higher than the Air Force had been expecting and were higher than Amazon's Commercial Service Catalog list prices contained in the Amazon cost-calculators.

218. When Air Force employees were unable to understand why the charges had increased, they turned directly to SAIC; Air Force employees arranged a conference call with SAIC Vice President Russ Fellers.

219. The conference call took place in March of 2022; without informing Fellers, Air Force employees also invited Amazon Principal Account Executive Andre Blazich to participate in this call and forwarded him the meeting ID and passcode information.

220. When the conference call began, Fellers was surprised that Blazich was participating in the call and immediately told Blazich to leave the call; Blazich did indeed leave the call.

221. Fellers didn't want Blazich to participate in the call because he didn't want an open-ended discussion of Amazon's pricing and discounts between the Air Force, SAIC, and Amazon in a format which Fellers couldn't control.

222. In mid-2022 relator became aware of the fact that some government employees had suspicions that SAIC was charging the Air Force more than the Amazon Service Catalog list price.

223. Relator had a conversation with Blazich about this, and Blazich told relator about a conversation he had earlier in the year with Russ Fellers.

224. In that conversation, Fellers admitted to Blazich that SAIC had in fact charged the Air Force an additional 8% over the Amazon Service Catalog list price; Fellers further admitted that this step had been taken because SAIC's margins on the CloudONE contract were too low and SAIC was not making enough money; Fellers continued that the reason SAIC's margins had slipped was because the Air Force was

not incurring as many charges under the Application and Migration time and materials CLINs as SAIC had anticipated when they bid the contract.

225. The Air Force's confusion was understandable, given the nature of the information withheld from the Air Force by SAIC, Amazon, and Microsoft, the truly massive amount of information needed to evaluate the monthly cloud charges, the incomplete nature of the information conveyed in the Showback Summary reports, the complexity of cloud computing and billing in general, and other factors.

226. Relator asked Blazich how SAIC could arbitrarily raise the prices 8% above the Amazon published prices for several months and get away with it; Blazich repeated what Fellers told him: "The government never noticed."

227. Relator is aware of one case with the ELISCAR customer where the customer was able to determine it was being charged more that the public Service Catalog price for one month around this same time and they were refunded that amount as a "billing error."

228. As a result, SAIC overcharged the United States and intentionally submitted false claims; those claims were false because SAIC intentionally charged the United States an additional 8% over the Commercial Catalog price that it was not obligated to pay, simply because SAIC's margins had dipped too low.

229. Therefore, for those months in late-2021 and early-2022, SAIC's illegal profits rose by an additional 8% over the Commercial Catalog price under CLIN 0010.

230. Amazon did not reveal the EDP overcharge and the 8% overcharge to the United States.

231. In the process of intentionally overcharging the United States by 8% for this limited period, SAIC made knowingly false claims to the United States, and then covered it up with the assistance of various Amazon employees as alleged herein.

232. All three defendants have, as alleged above, created and submitted false claims, and created false records material to those false claims; all three defendants, acting through their agents and employees, conspired together to conceal the truth from the Air Force and thus further enabled their fraud.

233. Indeed, the continued existence and viability of the fraud and false claims alleged in this Complaint depended on all three defendants maintaining strict secrecy and hiding the truth from the Air Force.

234. In those instances where the Air Force asked questions about whether it was being charged correctly, Amazon employees assisted SAIC in covering up its wrongdoing

235. Amazon employees including, but not limited to, Mary Oliva openly furthered the conspiracy and assisted SAIC by actively concealing true and correct information from the Air Force.

236. Oliva, who served as the primary communication link to SAIC, gave the Air Force false and misleading information multiple times in 2021 and 2022; for example, at certain times she told the Air Force that SAIC bundles the cost of common services into Amazon costs in the Showback Summary Reports, that SAIC's PMO costs are included in the Showback Summaries, and that the Amazon pricing calculator is complex and the Air Force customers are getting inaccurate prices because they are not operating it correctly.

237. As a result of the EDP overcharge and the intentional 8% overcharge by SAIC, false claims were submitted to the United States and the United States has been damaged in an amount to be proved at trial.

238. As a result of the conspiracy between Amazon, Microsoft and SAIC to defraud the Air Force, the United States has been damaged in an amount to be proved at trial.

**COUNT FOUR**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)-(B)**
**(SUBMISSION OF FALSE CLAIMS TO THE UNITED STATES)**
**(CREATION OF FALSE RECORDS AND STATEMENTS)**
**(VIOLATION OF THE PROHIBITION ON COST PLUS PERCENTAGE OF COSTS CONTRACTS)**
**(VIOLATION OF THE PROHIBITION ON KICKBACKS)**
**(VIOLATION OF THE PROHIBITION ON ORGANIZATIONAL CONFLICTS OF INTEREST)**
**(AGAINST SAIC, AMAZON, MICROSOFT, ACCENTURE FEDERAL SERVICES LLC., GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC., FOUR POINTS TECHNOLOGY LLC, CARAHSOFT TECHNONOLOGY CORP., DLT SOLUTIONS, INC., TECH DATA SOLUTIONS, LLC, AND STRATEGIC COMMUNICATIONS LLC, AND THE DEFENDANTS LISTED IN APPENDIX A)**

239. All preceding paragraphs are reincorporated.

240. Both major federal procurement statutes prohibit any “system” of contracting that allows a contractor to calculate its fee or profit as a percentage of the government’s costs; this type of prohibited arrangement is generally called a “cost plus percentage of cost” arrangement or sometimes a “CPPC” arrangement.

241. Both 10 U.S.C. § 3322 and 41 U.S.C. § 3905(a) simply state: “The cost-plus-a-percentage-of-cost system of contracting shall not be used.”

242. The following factors constitute a prohibited “cost plus percentage of cost” arrangement: (1) the contractor’s payment was a predetermined percentage rate; (2) the predetermined percentage rate was applied to actual performance costs; (3) the

exact amount of the contractor's entitlement was uncertain at time of contracting; and (4) the contractor's entitlement increased commensurately with the increased performance costs.

243. To allow a contractor to set its fee or profit as a percentage of the government's costs would, obviously, give the contractor an incentive to increase the government's costs as much as possible, which is exactly counter to the government's goal of minimizing its costs.

244. So-called "cost plus percentage of costs" contracts are not only prohibited by both major federal procurement statutes; this type of contract is also prohibited by every FAR provision that addresses the subject.

245. Among the FAR provisions prohibiting cost plus percentage of costs contracts is FAR clause 52.244-2(g) which states, in relevant part, that: "No subcontract or modification thereof placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis …".

246. This specific FAR provision was incorporated into the CloudONE contract.

247. The allegations above, however, clearly demonstrate that SAIC is receiving a profit calculated as a percentage of the government's costs and that defendants Amazon and Microsoft are paying kickbacks to SAIC calculated as a percentage of the government's costs.

248. In addition, defendants Accenture, GDIT, Four Points, Carahsoft, DLT Solutions, Tech Data Solutions, Strategic Communications—and all of the defendants listed on Appendix A to this First Amended and Supplemental Complaint—all had EDP contracts with Amazon similar or identical to the ones between Amazon and SAIC;

moreover, all of these defendants either re-sold Amazon cloud services to the United States or contracted with the United States to manage cloud services on behalf of the United States.

249. All of the defendants, in other words, profited when the Air Force spent more money on cloud because they received a percentage of that cost as a secret profit.

250. Because the United States does not pay fees or allow profits calculated as a percentage of the government's costs, all claims made by all the defendants under an EDP contract of this nature have been false.

251. Furthermore, each of these defendants also has an organizational conflict of interest in selling Amazon cloud services to the United States; by virtue of the cost plus percentage of cost nature of the EDP agreement, each re-seller has an incentive to cause its end customer to use more Amazon cloud services, not less, because the more Amazon cloud services the end customer uses, the more money the re-seller or MSP makes.

252. They have an additional organizational conflict of interest because they have contracts that require them to meet revenue targets and a growth target of 20% or more; they must push more government spend with Amazon to meet their cloud spend commitments.

253. All defendants have been enthusiastic participants in this illegal pricing agreement and all three have profited greatly from it.

254. Executives and Managers at Amazon are also heavily incentivized to push EDP agreements to all Amazon customers who resell Amazon cloud services or manage Amazon cloud services for the United States; in fact, Amazon not only offers specific

bonus payments to employees for selling EDP agreements to re-sellers and Managed Service Providers, it also offers a tool (in the form of an Excel Spreadsheet) that allows Managers and Executives to calculate the exact dollar amount of the individual performance bonus they will receive for an EDP sale.

255. The tool is called a "SPIF Calculator" because Amazon employees call an employee bonus based on sales a "SPIF."

256. The "SPIF Calculator" allows Amazon employees to select their job title, enter specific dollar values for the guaranteed total amount of the EDP contract, the percentage of the EDP discount, and so forth, and then determine their personal bonus payment (or "SPIF") for a hypothetical sale.

257. The SPIF Calculator is used extensively by Amazon employees so that they can understand the enormous bonus—which can in some situations be two or even three times a person's annual base salary—they will get if they sell an EDP to a reseller.

258. In total, based on reports used by Amazon to track the effectiveness and return on investment of EDP agreements, Amazon has paid a total of more than $725 million in EDP discounts just between January of 2019 and October of 2022; in addition to SAIC, these EDP payments were made to a long list of resellers and managed service providers including, but not limited to: Accenture Federal Services LLC, General Dynamics Information Technology, Inc., Four Points Technology LLC, Carahsoft Technology Corporation, DLT Solutions, Inc., Tech Data Solutions, LLC and the defendants listed on Appendix A to this Complaint.

259. Collectively, these defendants are currently under contract to provide over $1.6 billion in revenue to Amazon for the cloud computing needs of the United States; in

all cases, each of these defendants acts either as a reseller of cloud services or as a Managed Service Provider.

260. Defendant GDIT signed a contract with Amazon in October of 2020 that committed GDIT to sell at least $300 million in Amazon cloud services to the Center for Medicaid and Medicare Services ("CMS") and provided for kickbacks to GDIT if certain revenue goals were met; in addition, GDIT had two other EDP agreements that provided for it to purchase an additional $98million in cloud services from Amazon; defendant GDIT met these obligations, in part, by re-selling Amazon cloud services to the Federal Aviation Administration (FAA) and the Defense Information Systems Agency (DISA)

261. Defendant Accenture Federal Services signed an EDP contract with Amazon where it received a 45% discount in exchange for revenue commitments to Amazon to resell cloud to the Army's Enterprise Cloud Management Agency (ECMA) on their Cloud Account Management Optimization OTA contract. Relator was told Accenture was keeping 15% of the discount as profit. Accenture uses its Cloud Tracker product to manage cloud financial operations to lower costs. Relator was told Microsoft was discounting 55% in an effort to win this business and Amazon needed to match those discounts, or the applications would go to Microsoft. AWS refused to give a 55% discount but did give an unprecedented discount—for Amazon—of 45%, gambling that the 10% cost difference was too small for existing customers to incur the costs of switching to the Microsoft cloud. Liz Martin told relator and others in meetings that these discounts would end around May 2023.

262. Defendant Four Points signed a contract with Amazon in September of 2022 that committed Four Points to sell at least $378 million in Amazon cloud services to the United States and provided for kickbacks to Four Points if certain revenue goals were met; defendant Four Points also had 21 other EDP agreements with Amazon that required it to sell an additional $626 million in Amazon cloud services; Four Points met these obligations, in part, by re-selling Amazon cloud services to the Department of Veteran's Affairs on 4 separate EDP contracts totaling $558 million.

263. Defendant Carahsoft provided Amazon cloud services to the Department of Energy and signed a $85 million EDP agreement with Amazon that provided for Carahsoft to receive a hidden EDP kickback.

264. Defendant DLT Solutions provided Amazon cloud services to five different federal agencies each with a separate EDP agreement with Amazon to provide revenue commitments in exchange for the secret EDP discount. In total, DLT committed $78 million in revenue to Amazon across the five EDP agreements.

265. Defendant Tech Data provided Amazon cloud services to the Air Force Digital Directorate's Kessel Run division as a subcontractor to Strategic Communications. Tech Data signed a $6.1 million contract and had an EDP agreement with Amazon that provided for Tech Data to receive a 15% hidden EDP kickback.

266. Strategic Communications had a contract with the Air Force customer known as Kessel Run and resold cloud services to the Air Force using Tech Data's EDP. In late 2022, Kessel Run complained to Eric Waxvik, an Amazon employee, that their reseller was blocking access to billing console features preventing them from setting up alerts, causing them to have to pay for $30,000 of unwanted cloud expenditures. It

was shared with relator that Tech Data and Strategic Communications were concerned about meeting their spend commitments to Amazon and needed additional revenue; and denying Kessel Run access to the alert feature got them closer to their goal.

267. Because each of these defendants profit right along with Amazon from increased government cloud usage and increased cloud costs, each of these defendants has every incentive to maximize the government's costs and that is exactly what they have done.

268. Growing government cloud spend is very lucrative: Amazon pays the reseller a 5% Partner Growth Rebate for achieving a quarterly year-over-year growth rate of 45%; it also pays a 5% Partner Originated Discount on new accounts for 24 months and if the new account is for a new government customer (or project) Amazon pays another 5%, all in the form of Credit Memos.

269. The facts of this case demonstrate clearly that the government's prohibition on cost plus percentage of cost contracts is well-founded; using internal Amazon tools available to him relator was able to determine that MSPs and re-sellers given an EDP kickback—a category which includes but is not limited to all of the defendants in this count—showed a 214% increase in cloud expense between 2019 and 2022, while MSPs and resellers *not* given such an EDP program showed an increase of only 120% during the same period.

270. One example of how these defendants have managed to increase the government's costs and increase their own profit on selling and managing Amazon cloud services is the following: Amazon cloud re-sellers and managed service

providers are all able to generate a report for each customer that suggests various ways the customer can save money; these reports are tailored to each customer and make cost-saving recommendations based on that customer's applications, past usage, usage trends, and other important information.

271. If any of the defendants had provided these reports from Amazon to their government customers each customer would have learned important information that would have allowed the government to lower its costs for commercial cloud services.

272. Not only do these re-sellers not provide these reports to their customers—because it is not in the interests of Amazon or any of the re-sellers for the government to lower its cloud expenditures—these re-sellers take affirmative steps to hide this information from the government.

273. Meanwhile, as alleged above, SAIC not only didn't provide these reports to the government, but it also went so far as to create its own financial dashboard that allowed it to conceal these reports from the government—in addition to the specific types of information it concealed from the government as alleged in count three and elsewhere in this Complaint.

274. Amazon conspired with each of the defendants in this count to prevent the United States from accessing these tools or even being aware that these tools exist.

275. On one occasion, Amazon employee Liz Martin told relator that a reseller had called her and was irate because an Amazon employee had helped the reseller's customer optimize its cloud environment, lowering its monthly spend.

276. This reseller specifically told Martin that this error—i.e., providing a report that enabled the government customer to save money—had cost his company over $100,000 per year in sales.

277. As additional proof of Amazon's efforts to increase revenue and motivate its resellers, Amazon publishes manuals, power point presentations and other information for re-sellers and managed service providers that gives specific advice on how to maximize profits from re-selling (and managing) Amazon cloud services.

278. In addition Amazon offers many different resources to its employees to encourage them to sell EDPs.

279. As just one example, in 2022 Amazon employee Gautam Srivastava prepared a PowerPoint presentation titled "AWS Solution Provider Private Pricing Program" and on December 22, 2022 he did a recorded presentation for Amazon employees.

280. The third slide of this presentation states:

**Public Pricing Overview: Pricing or discount that is not available on the AWS website. It is offered as an incentive to foster customer commitments with AWS.**

281. By the term "commitments" Amazon means the re-seller's agreement to sell a certain amount of Amazon cloud to its customers, and the "pricing or discount" is offered as an "incentive" to "foster" these customer commitments to Amazon.

282. The fourth slide states clearly that the amount of the kickback increases the customer's cloud costs: **If a customer gets 10% EDP discount for $1M Commit, the spend on AWS services needs to be minimum $1.1M.**

283. Slide 12 of the presentation provides the following as part of a flow-chart for re-seller deals: **"Don't discuss discounts and commit with End Customer."** In other words, don't discuss discounts with the end customer, and don't let the end customer

know that their cloud reseller is committed to deliver a set amount of revenue to Amazon.

284. As alleged above, there are two different ways to connect Account IDs to a Payer Account; one method is called ECAM—which stands for "End Customer Account Model"—and the other method is called SPAM—which stands for "Solution Provider Account Model."

285. The difference between these two models is significant, because under the ECAM model the end customer has "root access," which means the end customer has control of the account and also has access to every account feature, including total visibility into account usage and billing information.

286. By way of contrast, under the SPAM model the reseller—and not the end customer—has root access and therefore only the reseller can access all of the Amazon cloud features, including those that allow an end customer to monitor their actual costs and get access to cost-saving reports based on their usage history. Moreover, under the SPAM model, the reseller has complete freedom to restrict end-customer access to whatever account features the reseller chooses.

287. In other words, customers having their Account IDs connected to a Payer Account by the SPAM method are at the complete mercy of the reseller or MSP and must rely totally on the reseller's good will to see the actual costs Amazon is charging for their cloud usage.

288. As part of the audio of his presentation, Srivastava says that "99%" of the nongovernmental end customers have the ECAM billing model, and essentially the only end customers having the SPAM billing model are government entities; in fact,

the SPAM billing model is the default setting for resellers selling cloud to the government.

289. Throughout the presentation Srivastava makes it clear that the commission to be paid to anyone selling an EDP deal is based on the increase in the customer's cloud spend after the EDP takes effect; Srivastava says in the presentation that **"We want to give the customer an incentive to use more AWS."**

290. All of the advice provided to re-sellers and managed service providers by Amazon results in increased costs for the United States.

291. All defendants have, as alleged above, created and submitted false claims and created false records material to those false claims; the claims were false because they violated the government's prohibition on cost plus percentage of costs contracts, because the claims were tainted by kickbacks, and also because each of these re-sellers had a conflict of interest.

292. As a result, the United States has been damaged in an amount to be determined at trial.

**COUNT FIVE**
**VIOLATION OF 31 U.S.C. § 3720(a)(1)(A)**
**FALSE CERTIFICATION OF COMPLIANCE GSA'S MOST FAVORED CUSTOMER AGREEMENT**
**(AGAINST AMAZON)**

293. All preceding paragraphs are reincorporated.

294. At all times relevant to this First Amended and Supplemental Complaint, Amazon participated in the General Service Administration's Multiple Award Schedule program.

295. As such, the Authorized Federal Supply Schedule (FSS) for Amazon stated the terms and conditions for government purchasers of Amazon cloud services and Amazon was bound by the representations it made on the FSS.

296. In order to continue to participate in the Multiple Award Schedule program, Amazon was required to disclose the prices it offered similarly situated commercial customers; these prices are disclosed on Appendix A to the Multiple Award Schedule.

297. Amazon offers the following services on is GSA Schedule: Cloud Computing and Cloud-Related IT Professional Services (I.D. # 518210C); Information Technology Training (I.D. # 611420); and Information Technology Professional Services (I.D. # 54151S).

298. For each of the above categories of services, Appendix A states on page 25:

**Amazon commercial pricing may be found at https:/aws.amazon.com/pricing.**

299. The commercial pricing resources referenced in Amazon's Multiple Award Schedule is the same public pricing calculator referenced throughout this First Amended and Supplemental Complaint, and like the other allegations, it did not represent the actual commercial price because non-governmental customers are routinely given bigger discounts.

300. On page 3 of its current Federal Supply Schedule, Amazon offers the following discount to the United States off the Service Catalog list price found in the public pricing calculators:

| One-Year Order Funded Amount | | GSA Discount |
|---|---|---|
| $1MM | <$5MM | 6% |
| $5MM | <$10MM | 8% |

| | | |
|---|---|---|
| $10MM | <$15MM | 9% |
| $15MM | <$20MM | 10% |

301. In other words, the maximum discount offered by Amazon on its FSS is 10% for contracts over $15 million but less than $20 million.

302. Elsewhere in the FSS, Amazon reports that for contracts in excess of $20 million, Amazon offers a discount of 14% to the United States.

303. As alleged throughout this Complaint, Amazon often gives much deeper discounts to its non-governmental customers, especially to re-sellers and managed service providers.

304. For example, non-governmental Amazon Partners routinely get a 17% discount with no spend commitment compared to a maximum of 10% available under the GSA pricing.

305. In addition, relator has first-hand knowledge that numerous other commercial customers are offered much more favorable terms than those offered the United States for contracts of a similar size.

306. As just one example, relator knows that Comcast was recently given a 29% discount off a contract for $20 million.

307. In other instances, companies reselling Amazon services to the United States are given discounts far in excess of those offered to the government under the GSA Supply Schedule; for example, defendant DLT Distributors was given a 22% Enterprise Discount Program on a $90 million contract with the Department of Defense Comptroller's Office.

308. In short, the most favored customer clauses found in the GSA schedule are not being followed by Amazon.

309. Amazon was required to certify on each invoice to the United States that it complied with its obligations under the GSA Federal Supply Schedule, and without these certifications Amazon's invoices to the United States would not have been paid.

310. These invoices were false and as a result the United States has been damaged.

311. Trial by jury is demanded.

RELATOR, ON BEHALF OF HIMSELF AND ON BEHALF OF THE UNITED STATES OF AMERICA prays for relief as follows: That the United States (a) be awarded three times the damages sustained because of the violations alleged herein in an amount to be proved at trial, as provided by the False Claims Act, 31 U.S.C. §§ 3729 et seq., and (b) that the maximum civil penalty under the federal False Claims Act be imposed for every false claim proven at trial; and (c) that pre-and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in prosecuting this case; (d) that Relator be awarded the maximum relator's share possible under the federal False Claims Act; and (e) in addition, relator requests any alternative or supplemental relief the court may deem appropriate.

DATED: February 13, 2023

Respectfully Submitted by Relator through Counsel:

Zachary A. Kitts
Virginia Bar # 47052
Counsel for Relator
K&G Law Group, PLLC
3554 Chain Bridge Road, Suite 100
Fairfax, Virginia 22030
Phone: 703-649-5500
Fax: 703-649-6363
Email: zkitts@kglawpllc.com

**CERTIFICATE OF SERVICE**

This is to certify that I served a copy of Relator's First Amended and Supplemental Complaint to AUSA Tanya Kapoor via hand-delivery and email to tanya.kapoor@usdoj.gov and DOJ Trial Attorney Elias Boujaoude via email at F.E.Boujaoude@usdoj.gov on February13, 2023.

Zachary A. Kitts
Virginia Bar # 47052
Counsel for Relator
K&G Law Group, PLLC
3554 Chain Bridge Road, Suite 100
Fairfax, Virginia 22030
Phone: 703-649-5500
Fax: 703-649-6363
Email: zkitts@kglawpllc.com

Appendix A: Other Defendants that Signed EDP Kick-Back Agreements with Amazon

1. Communications Training Analysis Corporation (CTAC)
2. Credence Management Solutions
3. Effectual Public Sector Inc.
4. JHT Technology
5. Enlighten IT Consulting
6. FCN Inc
7. Smartronix